# EXHIBIT A

016

Court File No. 09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION, NORTEL NETWORKS TECHNOLOGY CORPORATION, NORTEL COMMUNICATIONS INC., ARCHITEL SYSTEMS CORPORATION AND NORTHERN TELECOM CANADA LIMITED**

**ONE HUNDRED SIXTY FIRST REPORT OF THE MONITOR**
**DATED NOVEMBER 17, 2022**

## TABLE OF CONTENTS

INTRODUCTION ..........................................................................................................2

PURPOSE .................................................................................................................5

TERMS OF REFERENCE ..........................................................................................5

FEES AND DISBURSEMENTS OF THE MONITOR AND ITS COUNSEL FOR THE PERIOD ....................................................................................................................6

Fees and Disbursements for the Period...............................................................6
Monitor's Fees and Disbursements for the Period................................................6
Monitor's Counsel Fees and Disbursements for the Period...................................7
Disbursements During the Period .......................................................................8

SUMMARY OF THE WORK PERFORMED BY THE MONITOR AND ITS COUNSEL DURING THE PERIOD.............................................................................................8

Overview of Work During the Period................................................................ 9
CCAA Plan and Distributions to Creditors....................................................... 11
Tax Matters ................................................................................................. 13
Fourth Estate Matters.................................................................................... 13
Record Retention, IT Infrastructure and Other Administrative Matters...................... 14
Health and Welfare Trust................................................................................ 15
Nortel D&O Trust Termination ...................................................................... 16
IP Address Sale Process.................................................................................. 18
Sale of Other Assets...................................................................................... 19

CONCLUSION AND ORDER SOUGHT .................................................................19

## INTRODUCTION

1.   On January 14, 2009 (the "**Filing Date**"), Nortel Networks Corporation ("**NNC**" and collectively with all its subsidiaries "**Nortel**"), Nortel Networks Limited ("**NNL**"), Nortel Networks Technology Corporation, Nortel Networks International Corporation and Nortel Networks Global Corporation (collectively, with the New Applicants (as defined below), the "**Canadian Debtors**" or the "**Canadian Estate**") filed for and obtained protection under the *Companies' Creditors Arrangement Act* ("**CCAA**"). Pursuant to the Order of this Court dated January 14, 2009, as amended and restated (the "**Initial Order**"), Ernst & Young Inc. was appointed as the Monitor of the Canadian Debtors in the CCAA proceedings (the "**Monitor**").

2.   On March 18, 2016, Nortel Communications Inc., Architel Systems Corporation and Northern Telecom Canada Limited (collectively, the "**New Applicants**") sought and were

granted an Order (New Applicants) of this Court pursuant to the CCAA (the "**New Applicants Order**"). Pursuant to the New Applicants Order, each of the New Applicants was deemed to be an "Applicant" (as defined in the Initial Order) in the CCAA proceedings, entitled to all of the rights, benefits and protections granted by, and otherwise subject to, among other Orders of this Court entered in the CCAA proceedings, the Initial Order as if it were an Applicant thereunder. The New Applicants Order also procedurally consolidated the CCAA proceedings of the New Applicants with the CCAA proceedings.

3.　　On January 24, 2017, this Court sanctioned the Plan of Compromise and Arrangement pursuant to the *Companies' Creditors Arrangement Act* concerning, affecting and involving the Canadian Debtors dated November 30, 2016 (the "**Plan**"). The Plan became effective on May 8, 2017, and was implemented on May 25, 2017. The CCAA stay of proceedings was, subject to further Order of the Court, extended indefinitely by this Court in its Sanction Order dated January 24, 2017 (the "**Sanction Order**").

4.　　Nortel Networks Inc. ("**NNI**") and certain of its U.S. subsidiaries and affiliates filed voluntary petitions under Chapter 11 of the U.S. Bankruptcy Code (the "**Code**") in the United States Bankruptcy Court for the District of Delaware (the "**U.S. Court**") on January 14, 2009 (together with the Chapter 11 proceedings of NN CALA and NNIII (each as defined below), the "**Chapter 11 Proceedings**"). As required by U.S. law, an official committee of unsecured creditors was established in January 2009. Nortel Networks (CALA) Inc. ("**NN CALA**" and together with NNI and certain of its subsidiaries and affiliates that filed on January 14, 2009, and NNIII, the "**U.S. Debtors**") filed a voluntary petition under Chapter 11 of the Code in the U.S. Court on July 14, 2009. Nortel Networks India International Inc. ("**NNIII**") initiated Chapter 11 proceedings on July 26, 2016. On January 24, 2017, the U.S. Court entered an order confirming a joint Chapter 11 plan (the "**Chapter 11 Plan**") for each of the U.S. Debtors (with the exception of NNIII) and the effective date of the Chapter 11 Plan was May 8, 2017. On October 13, 2021, the U.S. Court entered an order confirming a Chapter 11 plan for NNIII.

5.　　As of the date hereof, the Chapter 11 Proceedings of each of NNI, NN CALA, Nortel Networks Capital Corporation, and NNIII remain pending. The U.S. Court previously

entered final decrees closing the Chapter 11 Proceedings of all the other U.S. Debtors whose estates had been fully administered. NNI, NN CALA and NNIII made final distributions to their creditors in December 2019, March 2020 and April 2022, respectively, and are completing remaining wind-down activities. NNI has assigned certain residual assets to NNL as part of its wind-down activities.

6. An ad hoc group of holders of bonds issued by NNL, NNC and Nortel Networks Capital Corporation organized and participated in these proceedings as well as the Chapter 11 Proceedings. As described in prior reports, the holders of Crossover Bond Claims received their respective Creditor Maximums in 2018 and, as such, the ad hoc group of holders of bonds is no longer participating in these proceedings.

7. In addition, pursuant to certain Orders of this Court, representative counsel was appointed on behalf of the former employees of the Canadian Debtors and the LTD Beneficiaries (collectively, "**Representative Counsel**") as well as independent counsel to the continuing employees of the Canadian Debtors. The participation of Representative Counsel in the CCAA proceedings wound down during 2019 as matters with respect to former employees and LTD Beneficiaries were resolved and effective March 31, 2021, the Court-appointed representatives of the former employees and LTD Beneficiaries and Representative Counsel were discharged and released from their roles and duties.

8. Nortel Networks UK Limited and certain of its affiliates located in EMEA (collectively, the "**EMEA Debtors**") were granted administration orders (the "**U.K. Administration Orders**") by the High Court of England and Wales on January 14, 2009 (the "**U.K. Administration Proceedings**"). The U.K. Administration Orders appointed Alan Bloom, Stephen Harris, Alan Hudson and Chris Hill of Ernst & Young LLP as administrators of the various EMEA Debtors, except for Nortel Networks (Ireland) Limited, to which David Hughes (Ernst & Young LLP Ireland) and Alan Bloom were appointed (collectively, the "**Joint Administrators**"). Certain of the EMEA Debtors have proposed and implemented company voluntary arrangements under the *Insolvency Act 1986* (U.K.)

9. Subsequent to the Filing Date, certain other Nortel subsidiaries filed for creditor protection or bankruptcy proceedings in the local jurisdiction in which they are located.

**PURPOSE**

10.    The purpose of this One Hundred Sixty First Report of the Monitor (the "**Report**"), along with the related affidavits sworn by Brent Beekenkamp, Senior Vice President of Ernst & Young Inc., and representatives of the Monitor's counsel, being Goodmans LLP ("**Goodmans**") as its Canadian legal counsel, Allen & Overy LLP ("**A&O**") as its U.S. legal counsel, and Pachulski Stang Ziehl & Jones LLP ("**PSZJ**") as its Delaware local legal counsel, is to provide this Court with information in respect of the Monitor's motion to pass the accounts of the Monitor and of its counsel for fees and disbursements incurred during the period November 1, 2021, through to and including October 31, 2022 (the "**Period**").[1]

**TERMS OF REFERENCE**

11.    The Monitor has made various materials relating to the CCAA proceedings available on its website at www.ey.com/ca/nortel. The Monitor's website also contains a dynamic link to Epiq Bankruptcy LLC's website where materials relating to the Chapter 11 Proceedings are posted.

12.    This Report has been prepared on a basis consistent with the Monitor's prior fee approval reports, being the One Hundred Thirty Second Report of the Monitor dated November 16, 2016 (the "**One Hundred Thirty Second Report**"); the One Hundred Thirty Ninth Report of the Monitor dated May 9, 2017; the One Hundred Forty Eighth Report of the Monitor dated August 16, 2018; the One Hundred Fifty Third Report of the Monitor dated November 13, 2019; the One Hundred Fifty Sixth Report of the Monitor dated November 12, 2020; and the One Hundred Fifty Ninth Report of the Monitor dated December 2, 2021. Certain additional background details regarding these proceedings and the role of the Monitor, its counsel and their respective key personnel are provided in the One Hundred Thirty Second Report, which is incorporated herein by reference. Copies of the aforementioned reports are available on the Monitor's website.

---

[1] The Period for the Monitor's fees and disbursements runs from October 30, 2021 to October 28, 2022.

13. Unless otherwise stated, all monetary amounts contained herein are expressed in U.S. dollars.

14. Capitalized terms used herein and not otherwise defined have the meaning given to them in the One Hundred Thirty Second Report, the Plan or the Final HWT Distribution Order (as defined below).

**FEES AND DISBURSEMENTS OF THE MONITOR AND ITS COUNSEL FOR THE PERIOD**

*Fees and Disbursements for the Period*

15. The fees and disbursements of the Monitor and its counsel for the Period are as follows:

| | Fees November 1, 2021 - October 31, 2022 | Disbursements | Taxes | Total |
|---|---|---|---|---|
| Ernst & Young Inc. | 2,351,108.00 | 30,823.55 | 309,651.22 | 2,691,582.77 |
| Goodmans LLP | 228,592.50 | 649.54 | 29,801.48 | 259,043.52 |
| **Total Fees (CAD)** | **2,579,700.50** | **31,473.09** | **339,452.70** | **2,950,626.29** |
| | | | | |
| Allen & Overy LLP | 71,473.35 | 2,275.25 | - | 73,748.60 |
| Pachulski Stang Ziehl & Jones LLP | 2,478.00 | 1,277.82 | - | 3,755.82 |
| **Total Fees (USD)** | **73,951.35** | **3,553.07** | **-** | **77,504.42** |

*Monitor's Fees and Disbursements for the Period*

16. Attached as Appendix "A" hereto is a listing of the Monitor's accounts for the Period, including each account date and amount. Attached as Appendix "B" hereto is a summary table which identifies the individual professionals of the Monitor that have worked on the Nortel file during the Period along with their rank, average hourly billing rate, total number of hours worked, total associated professional fees and the primary work stream(s) in the CCAA proceedings in which the professional has been involved during the Period.[2]

---

[2] Individual professionals working less than 20 hours have been aggregated in a single line item at each given rank.

17. The Monitor seeks approval of its accounts for the Period in the amount of CA$2,691,582.77, inclusive of applicable taxes. This amount includes billings for 4,362.0 professional hours at an average hourly rate of CA$539.

18. The Monitor's professional rates, as well as its disbursements, are comparable to the rates charged by other professional firms in the Toronto market for the provision of similar services regarding significant complex commercial restructuring matters.

19. As noted, the table at Appendix "B" includes the average hourly billing rate for each Monitor professional based on his or her total hours worked on the file and the time period during which those hours were worked. The hourly rates of the Monitor's professionals have increased during the Period as a result of a yearly review of rates charged relative to market.

20. The Monitor's accounts for the Period have been paid by the Canadian Debtors in the normal course since the commencement of the CCAA proceedings as authorized by the Initial Order.

*Monitor's Counsel Fees and Disbursements for the Period*

21. The Monitor also seeks to pass the accounts of Goodmans for the Period in the amount of CA$259,043.52, inclusive of applicable taxes. This amount includes billings for 296.4 professional hours at an average hourly rate of CA$771. Goodmans continues to act as the Monitor's lead legal counsel and represents the Monitor in connection with all matters in the CCAA proceedings.

22. The Monitor also seeks to pass the accounts of A&O for the Period in the amount of $73,748.60. This amount includes billings for 117.1 professional hours at an average hourly rate of $610. A&O continues to represent the Monitor in connection with the Chapter 15 recognition proceedings, the Chapter 11 Proceedings and all other U.S. law and certain foreign law matters.

23. The Monitor also seeks to pass the accounts of PSZJ for the Period in the amount of $3,755.82. This amount includes billings for 3.9 professional hours at an average hourly

rate of $635. PSZJ continues to represent the Monitor in connection with Delaware law matters, including in connection with filings with the U.S. Court.

24. The accounts submitted for the Period by each of Goodmans, A&O and PSZJ have been reviewed by the Monitor as and when received, authorized for payment by the Monitor and paid by the Canadian Debtors in the normal course as authorized by the Initial Order. Based upon the Monitor's review of counsel's accounts, the Monitor believes such accounts to be reasonable and that they reflect billings for services performed by the Monitor's counsel consistent with the instructions given by the Monitor to such counsel, all at such counsel's standard rates and charges for legal services at the relevant times.[3]

*Disbursements During the Period*

25. The Monitor has conducted a review of its disbursements and those of its counsel for the Period. The Monitor and its counsel's disbursements were primarily incurred on account of: (i) noticing, advertising, mailing and courier fees incurred in connection with distributions and related tax slips (77%); (ii) travel and meetings (12%); and (iii) fees incurred with respect to Court filings, computer searches and printing/photocopying (11%).

## SUMMARY OF THE WORK PERFORMED BY THE MONITOR AND ITS COUNSEL DURING THE PERIOD

26. The paragraphs that follow provide a summary description of the work undertaken by the Monitor and its counsel during the Period. Most of the work streams discussed below began prior to the Period and, in some cases, will continue beyond the Period. The Monitor has indicated the approximate timeframe of the work streams discussed below.

27. In addition to the description provided herein, the Monitor has filed 160 reports with the Court to date (including three reports during the Period) that detail the activities of the Canadian Debtors and the Monitor throughout these proceedings and the professional fees and disbursements of (among others) the Monitor and its counsel. Copies of these reports

---

[3] To the extent requested, copies of the detailed accounts of the Monitor and its counsel are available for the Court's review, subject to further direction and Order of this Court that the Monitor may request relating to matters of privilege and confidentiality.

are available on the Monitor's website at www.ey.com/ca/nortel and are incorporated herein by reference to the extent necessary.

*Overview of Work During the Period*

28. During the Period, the Monitor and its counsel's work included continuing implementation of the Settlement and Plans Support Agreement ("**SPSA**") and the Plan and other CCAA administration matters, including initiating a fourth distribution pursuant to the Plan (the "**Fourth Distribution**") in March 2022 of approximately $38 million to approximately 15,000 unsecured creditors, bringing cumulative distributions to approximately $4.5 billion. The administration of the Initial, Second, Third and Fourth Distributions continued through the Period, with over 510 cheque re-issues totalling approximately $1.0 million in respect of Initial, Second, Third and Fourth Distributions after conducting search activities to locate individuals with uncashed cheques, and processing address and status changes.

29. Significant efforts were expended by the Monitor (and, in some cases, its counsel) in respect of the following activities during the Period, which are discussed in greater detail below:

    (a)      administration of the Initial, Second, Third and Fourth Distributions, which included following-up on uncashed cheques and the re-issuance of cheques, as necessary;

    (b)      administration of the Final HWT Distribution pursuant to the Final HWT Distribution Order, and activities to advance the closing of the HWT account;

    (c)      entered into an assignment agreement with NNI pursuant to which certain of NNI's residual assets were assigned to NNL, as part of NNI's wind-down;

    (d)      entered into and closed an asset purchase and settlement agreement with a third party that asserted an interest in approximately 65,000 IP addresses which NNL acquired via assignment from NNI;

(e)    negotiated, entered into and closed a share purchase agreement in respect of a minority share interest in a private company which NNL acquired via assignment from NNI;

(f)    worked with the trustee of the Nortel D&O Trust (the "**Trustee**") regarding the wind-up of the Nortel D&O Trust, including assisting the Trustee in providing notice to potential beneficiaries of the Nortel D&O Trust regarding its pending termination;

(g)    preparation and mailing of the tax slips for distributions made during calendar year 2021;

(h)    ongoing records disposal efforts in accordance with the Order (Disposal of Records #2) dated September 11, 2018;

(i)    responding to creditor inquires; and

(j)    ongoing maintenance of the claims database.

30.    The Monitor has also continued to work to progress the wind-up and repatriation of funds from the Canadian Debtors' foreign controlled subsidiaries. Receipts from those subsidiaries and the U.S. Debtors in the form of distributions on intercompany claims and equity interests were $9.4 million during the Period.

31.    During the Period, the Monitor's efforts have also been focused on reducing the Canadian Estate's operating costs, including exiting the Canadian Debtors last physical office location, while working to achieve final resolution of outstanding matters. The Canadian Estate will need to maintain the capability to make future distributions and meet its tax and reporting requirements for an extended period as certain outstanding matters, such as the conclusion of various foreign proceedings and the related wind-up or liquidation of controlled foreign subsidiaries, will take further time. This streamlining will allow for the efficient administration of the Canadian Estate for the timeframe required to wind-up its affairs.

32. The Monitor also continues to update the Monitor's website and respond to creditor inquiries, including exchanging emails through the Monitor's email address (which totalled more than 1,500 emails during the Period) and a toll-free telephone line (which received more than 800 calls through the Period). The Monitor also received and processed more than 760 change of address and other creditor notifications during the Period, resulting in redirection or reissue of some or all distributions made to certain creditors.

*CCAA Plan and Distributions to Creditors*
(Timeframe: June 2016 – Ongoing)

33. As further described in the One Hundred Thirty Second Report, the Monitor (on behalf of the Canadian Estate), the U.S. Debtors and the EMEA Debtors and their main creditor constituents entered into the SPSA in October 2016, which agreement resolved the allocation of the approximately $7.3 billion of sale proceeds held in escrow and provided for a comprehensive resolution of numerous other claims and issues in these proceedings. This Court sanctioned the Plan, which incorporated the SPSA, on January 24, 2017. The Plan and the SPSA became effective on May 8, 2017, and the Plan was implemented on May 25, 2017.

34. The activities of the Monitor in connection with the Plan during the Period included:

    (a) continuing activities associated with the administration of the Initial, Second and Third Distributions to creditors, including:

        (i) analyzing the population of uncashed distribution cheques and making efforts to locate and obtain updated contact information for the creditors to whom the cheques relate;

        (ii) replacing or redirecting hundreds of cheques for those creditors who had moved, changed names (including where cheques had to be reissued to the estate of a creditor) or had otherwise misplaced their Initial, Second or Third Distribution cheques;

    (iii)    preparing and mailing over 1,400 tax slips and related pieces of tax correspondence to those unsecured creditors whose Third Distribution and HWT Distribution were subject to withholding and other taxes; and

    (iv)    responding to CRA inquiries related to individual creditor's tax slips and the status of remittance accounts;

(b)    initiating the Fourth Distribution to creditors during March 2022, which totalled approximately $38 million to more than 15,000 creditors. The administration of the Fourth Distribution included:

    (i)    preparing and posting notice of the Fourth Distribution Date (in English and French);

    (ii)    calculating the amount of the Fourth Distribution rate, preparing notice thereof and posting the notice (in English and French);

    (iii)    preparing the format of the statement to accompany the Fourth Distribution (in English and French);

    (iv)    preparing a guide to the Fourth Distribution made available to Compensation Creditors along with their payment and statement (in English and French);

    (v)    submitting distribution information to ESDC and liaising frequently with ESDC on the status of ESDC's review of the distribution information;

    (vi)    preparing and mailing approximately 15,000 cheques and statements to unsecured creditors who received a Fourth Distribution;

    (vii)    responding to numerous telephone calls and emails in respect of the Fourth Distribution, ESDC review, tax slips and assessment issues encountered as a result of individuals filing tax returns;

(viii)  working to find updated address or contact information in respect of hundreds of outstanding or returned Fourth Distribution cheques; and

(ix)  working with individual trade creditors who are in receipt of a distribution cheque payable to an entity that no longer exists and issuing new distribution cheques, as appropriate.

*Tax Matters*

(Timeframe: January 2009 – Ongoing)

35.  The activities of the Monitor in connection with the Canadian Debtors' tax matters during the Period included:

(a)  preparation and filing of income tax returns for the year ended December 31, 2021, and preparation, distribution and filing of over 1,400 tax slips and summaries related to the Third Distribution and HWT Distribution; and

(b)  preparation, collection, remittance and monthly reporting of HST, as applicable.

*Fourth Estate Matters*

(Timeframe: November 2009 – Ongoing)

36.  As at the Filing Date, Nortel was a worldwide multi-national company that operated in almost every country in the world and had approximately 126 corporate subsidiaries. Many of these entities, including numerous legal entities in the APAC and CALA regions, are (or were) direct or indirect subsidiaries of NNL. A significant focus of the Monitor's efforts has been on restructuring, liquidating and winding-up these controlled entities such that any remaining value can be repatriated to NNL for the benefit of creditors.

37.  The activities of the Monitor and its counsel in connection with APAC/CALA matters during the Period included:

(a)  assisting in the resolution of various tax matters pertaining to the wind up of the APAC/CALA entities;

(b) engaging in ongoing communications and discussions with liquidators and other administrators of the remaining APAC/CALA entities with respect to the wind-up or liquidation of the APAC/CALA entities with a view to recovering on intercompany claims and/or the equity of those entities as their wind-up or liquidation is completed; and

(c) coordinating with local counsel and assisting in the preparation of various submissions to the Thai official receiver in respect of NNL's claim (among others) against Nortel Networks (Thailand) Limited.

*Record Retention, IT Infrastructure and Other Administrative Matters*
(Timeframe: June 2010 – Ongoing)

38. The Canadian Debtors are required to retain certain hard copy and electronic documents and maintain certain IT and accounting systems, along with related infrastructure, to assist in: (i) meeting various tax and other statutory reporting requirements; (ii) administering the Canadian Debtors' claims processes; (iii) preparing and filing the necessary documentation in support of its claims against foreign affiliates; and (iv) supporting the wind down of its foreign affiliates to allow for the repatriation of funds through intercompany claims and equity interests in those affiliates.

39. The Canadian Debtors previously completed the decommissioning and transition of their IT infrastructure, including completing the migration of all their foreign affiliates to their own stand-alone accounting systems. The Canadian Debtors will continue to maintain certain hard copy records and electronic data until completion of their tax and statutory filing requirements and wind up of their foreign affiliates.

40. To assist in the transition and a reduction in the volume of records retained by the Canadian Debtors, the Monitor obtained an order of the Court on September 11, 2018, to permit the Canadian Debtors and Monitor to dispose of all remaining hard copy and electronic records of the Canadian Estate except for certain specified records. Since obtaining that order, the Monitor has worked diligently with the Canadian Debtors to arrange for the destruction of over 25,000 boxes of records and to identify further records for destruction.

41.     The activities of the Monitor in connection with these and other administrative matters during the Period included:

(a)     ongoing monitoring of disbursements and banking activities;

(b)     organized the Canadian Debtors' move out of the last physical space they were occupying and changed their registered address accordingly;

(c)     providing assistance with preparation of financial information for tax purposes and reporting to this Court; and

(d)     consulting on records destruction with a resulting reduction in storage costs.

*Health and Welfare Trust*
(Timeframe: March 2010 – Ongoing)

42.     The HWT was established to provide certain benefits to the Canadian Debtors' employees. During the course of these proceedings, approximately CA$76 million has been distributed from the HWT to participating beneficiaries.  Certain HWT distributions, including those made during prior periods, remained outstanding or unpaid as the beneficiaries had not been located.  On November 23, 2020, the Monitor sought, and this Court granted, the Final HWT Distribution Order to address prior HWT distributions that remained uncashed, and effect final distributions and the completion of the administration of the HWT, including the barring and release of any claims to unclaimed distributions under the HWT.

43.     The activities of the Monitor in connection with the HWT during the Period included:

(a)     engaging in efforts to locate individuals who had not cashed their Final HWT Distribution payment;

(b)     preparing and reissuing over 550 Final HWT Distribution cheques for Participating Beneficiaries;

(c)     processing approximately 740 address changes and approximately 40 waivers, and responding to over 800 calls and having over 1,500 e-mail exchanges with creditors, many of which related to the HWT;

(d)     preparing and issuing individual tax slips and corresponding tax information summaries, where required, related to the Final HWT Distribution;

(e)     posting notice on the Monitor's website that HWT cheques must be cashed by June 30, 2022;

(f)     confirming to the issuing bank to stop all Final HWT Distributions which remained outstanding after June 30, 2022;

(g)     compiling fees and expenses associated with the production, mailing and advertising of the Final HWT Distribution for payment, and reconciling the remaining HWT funds in the HWT Account to the books and records;

(h)     sending correspondence to CRA with respect to the closure of the non-resident withholding account; and

(i)     compiling a list of tax slips to be cancelled as a result of waivers received or uncashed Final HWT Distribution cheques.

*Nortel D&O Trust Termination*
(Timeframe: October 2021 – May 2022)

44.     NNC established the Nortel D&O Trust pursuant to a trust indenture made as of January 13, 2009 (the "**Trust Indenture**"), in the amount of approximately CA$12 million for the benefit of Nortel's directors and officers to provide financial support for the defence and payment of certain claims against them to the extent that directors' and officers' insurance maintained by NNC was inadequate, and also to pay for the maintenance of such insurance. Pursuant to the Trust Indenture, the Nortel D&O Trust was to terminate (among other ways) when certain timeframes, as contemplated in the Trust Indenture, expired. As further described in the One Hundred Fifty Eighth Report and One Hundred Sixtieth Report, the Nortel D&O Trust terminated on December 6, 2021, in accordance with its terms.

45.     Following December 6, 2021, substantially all of the trust property was delivered to the Canadian Estate. The Trustee held a small reserve for final tax liabilities and other wind-up expenses of the Nortel D&O Trust. In May 2022, residual amounts were remitted to

the Canadian Estate and the Trustee informed the Monitor that he had closed the Nortel D&O Trust's bank account and wound-up the Nortel D&O Trust as of May 31, 2022.

46.    The activities of the Monitor and its counsel in connection with the termination of the Nortel D&O Trust during the Period included:

(a)    consulting with the Trustee and D&O Counsel with respect to the pending termination of the Nortel D&O Trust;

(b)    reviewing the Canadian Debtors' records and compiling a list of all Nortel's directors and officers for the period on or after January 13, 2009, that may be potential beneficiaries;

(c)    seeking assistance from the Joint Administrators, U.S. Debtors and representatives of certain of the foreign Nortel estates for contact information;

(d)    assisting in the preparation of a form of notice from the Trustee to the potential beneficiaries, advising of the pending termination of the Nortel D&O Trust;

(e)    assisting in sending the notice from the Trustee to potential beneficiaries located around the world by mail and email;

(f)    posting a notice advising of the pending termination of the Nortel D&O Trust on the Monitor's Website; and

(g)    addressing a potential beneficiary's inquiry about a potential liability claim relating to a Nortel affiliate in EMEA that was dissolved in 2009, but subsequently restored in 2014. The Monitor and its counsel made enquiries with the claimant's solicitor, and the solicitor confirmed that the matter was related to an incident that was time-barred and had concluded in 2015. The Monitor liaised with the Trustee and D&O counsel regarding the Monitor's efforts to review the issue and its findings, and the Trustee subsequently proceeded to distribute the funds held in the Nortel D&O Trust as outlined previously.

*IP Address Sale Process*

(Timeframe: March 2011 – November 2021)

47. On March 25, 2011, this Court granted an Order authorizing the Monitor to conduct a sale process for the Canadian Debtors' remaining IT assets, most notably approximately 17 million legacy internet protocol (IPv4) addresses (the "**IP Addresses**"). From 2011 through 2019, the Canadian Debtors divested substantially all of those IP Addresses through 14 separate Court-approved transactions with a variety of purchasers identified in prior reports.

48. In November 2021, the Monitor and NNI finalized an assignment of any interest NNI may have in approximately 65,000 IP Addresses to the Canadian Estate as part of NNI's wind-up process. The Monitor became aware that a third party also claimed an interest in these IP Addresses. As further described in the One Hundred Fifty Eighth Report, the Monitor, on behalf of the Canadian Estate, negotiated an asset purchase and settlement agreement whereby NNL agreed to transfer its interest in these IP Addresses to the third party for a cash purchase price, which transaction closed in December 2021. This transaction represents the final IP Address transaction of the Canadian Debtors and concludes the IP Address sale process.

49. The activities of the Monitor and its counsel in connection with this IP Address transaction during the Period included:

(a) concluding negotiation of transaction documentation and closing the transaction; and

(b) exchanging correspondence and meeting with representatives of the American Registry for Internet Numbers and the purchaser regarding the transfer of the subject IP Addresses.

(Timeframe: November 2021 – June 2022)

50.     In November 2021, NNL and NNI finalized the assignment of a minority share interest
        NNI held in a private U.S.-based technology company to NNL. The Monitor notified the
        subject company of the assignment and accessed certain financial information from it in
        preparation for a sale of NNL's interest. The company subsequently advised the Monitor
        that certain existing shareholders were interested in acquiring the shares and the Monitor,
        on behalf of the Canadian Estate, engaged in discussions and negotiations regarding a
        potential transaction.

51.     On June 15, 2022, NNL and certain shareholders of the company, as purchasers, entered
        into a Stock Purchase Agreement whereby NNL agreed to sell its minority interest for a
        cash purchase price ("**Purchase Price**") that is not material to the Canadian Estate's
        financial position. On June 20, 2022, the Canadian Estate received the full Purchase Price
        and the transaction closed on the same day. The transaction was completed pursuant to the
        *de minimus* sale provisions of the Initial Order.

52.     The activities of the Monitor and its counsel in connection with this transaction during the
        Period included:

        (a)     negotiating and entering into a form of non-disclosure agreement to access financial
                information from the subject company;

        (b)     reviewing and evaluating the financial and other information provided by the
                company; and

        (c)     negotiating with the purchasers and entering into and closing the sale transaction.

**CONCLUSION AND ORDER SOUGHT**

53.     The efforts of the Monitor and its counsel during the Period resulted in further progress
        being made in these CCAA proceedings, including the ongoing implementation of the Plan
        through a further distribution to creditors. In addition, substantial progress was made with

respect to final distributions from the HWT and closing of the HWT Account. Finally, the Monitor has also recovered more than $21 million during the Period for the benefit of the Canadian Estate's creditors.

54.    The Monitor believes its fees and disbursements and those of its counsel for the Period are fair and reasonable and respectfully requests that this Court approve the fees and disbursements of the Monitor and its counsel for the Period.

All of which is respectfully submitted this 17th day of November, 2022.

**ERNST & YOUNG INC.**
**in its capacity as Monitor of Nortel Networks Corporation** *et al.*
**and not its personal capacity**

Per:

Murray McDonald
Chairman



**Nortel Networks**
**Professional Fees Invoice Summary - Ernst & Young Inc.**
**November 1, 2021 to October 31, 2022**

| Invoice Number | Invoice Date | Service Period | Fee | Expenses | Taxes | Total |
|---|---|---|---|---|---|---|
| CA12C500007385 | 09-Nov-21 | October 30-November 5, 2021 | 98,208.00 | - | 12,767.04 | 110,975.04 |
| CA12C500007404 | 16-Nov-21 | November 6-November 12, 2021 | 66,632.50 | 8,393.39 | 9,753.37 | 84,779.26 |
| CA12C500007427 | 23-Nov-21 | November 13-November 19, 2021 | 65,779.50 | 715.55 | 8,644.36 | 75,139.41 |
| CA12C500007445 | 30-Nov-21 | November 20-November 26, 2021 | 52,587.00 | 676.79 | 6,924.29 | 60,188.08 |
| CA12C500007491 | 07-Dec-21 | November 27-December 3, 2021 | 54,483.50 | - | 7,082.86 | 61,566.36 |
| CA12C500007517 | 14-Dec-21 | December 4-December 10, 2021 | 54,865.50 | 210.36 | 7,159.87 | 62,235.73 |
| CA12C500007546 | 21-Dec-21 | December 11-December 17, 2021 | 37,828.50 | 8.04 | 4,918.76 | 42,755.30 |
| CA12C500007570 | 04-Jan-22 | December 18-December 31, 2021 | 18,527.50 | - | 2,408.58 | 20,936.08 |
| CA12C500007596 | 11-Jan-22 | January 1-January 7, 2022 | 11,618.50 | 239.43 | 1,541.54 | 13,399.47 |
| CA12C500007625 | 18-Jan-22 | January 8-January 14, 2022 | 32,559.50 | 30.28 | 4,236.68 | 36,826.46 |
| CA12C500007650 | 25-Jan-22 | January 15-January 21, 2022 | 28,920.50 | - | 3,759.67 | 32,680.17 |
| CA12C500007678 | 02-Feb-22 | January 22-January 28, 2022 | 33,996.00 | 72.65 | 4,428.92 | 38,497.57 |
| CA12C500007721 | 08-Feb-22 | January 29-February 4, 2022 | 50,797.50 | - | 6,603.68 | 57,401.18 |
| CA12C500007740 | 15-Feb-22 | February 5-February 11, 2022 | 57,429.00 | - | 7,465.77 | 64,894.77 |
| CA12C500007763 | 22-Feb-22 | February 12-February 18, 2022 | 58,479.50 | 36.33 | 7,607.06 | 66,122.89 |
| CA12C500007776 | 01-Mar-22 | February 19-February 25, 2022 | 58,398.50 | - | 7,591.81 | 65,990.31 |
| CA12C500007814 | 08-Mar-22 | February 26-March 4, 2022 | 61,870.00 | 1,342.92 | 8,217.68 | 71,430.60 |
| CA12C500007843 | 16-Mar-22 | March 5-March 11, 2022 | 64,728.00 | - | 8,414.64 | 73,142.64 |
| CA12C500007868 | 22-Mar-22 | March 12-March 18, 2022 | 74,897.50 | - | 9,736.68 | 84,634.18 |
| CA12C500007875 | 29-Mar-22 | March 19-March 25, 2022 | 105,484.00 | 221.36 | 13,741.70 | 119,447.06 |
| CA12C500007903 | 05-Apr-22 | March 26-April 1, 2022 | 140,348.00 | - | 18,245.24 | 158,593.24 |
| CA12C500007918 | 12-Apr-22 | April 2-April 8, 2022 | 73,048.00 | 1,022.46 | 9,629.16 | 83,699.62 |
| CA12C500007943 | 19-Apr-22 | April 9-April 15, 2022 | 48,791.50 | 14,634.86 | 8,245.43 | 71,671.79 |
| CA12C500007965 | 26-Apr-22 | April 16-April 22, 2022 | 47,716.50 | 212.15 | 6,230.73 | 54,159.38 |
| CA12C500007993 | 03-May-22 | April 23-April 29, 2022 | 38,532.50 | - | 5,009.23 | 43,541.73 |
| CA12C500008018 | 10-May-22 | April 30-May 6, 2022 | 58,666.00 | - | 7,626.58 | 66,292.58 |
| CA12C500008039 | 17-May-22 | May 7-May 13, 2022 | 54,561.00 | - | 7,092.93 | 61,653.93 |
| CA12C500008059 | 24-May-22 | May 14-May 20, 2022 | 39,482.50 | 94.22 | 5,144.98 | 44,721.70 |
| CA12C500008079 | 31-May-22 | May 21-May 27, 2022 | 41,044.00 | 238.85 | 5,366.77 | 46,649.62 |
| CA12C500008107 | 07-Jun-22 | May 28-June 3, 2022 | 52,055.50 | 108.41 | 6,781.31 | 58,945.22 |
| CA12C500008169 | 14-Jun-22 | June 4-June 10, 2022 | 54,503.50 | 487.02 | 7,148.77 | 62,139.29 |
| CA12C500008202 | 21-Jun-22 | June 11-June 17, 2022 | 50,177.00 | - | 6,523.01 | 56,700.01 |
| CA12C500008235 | 28-Jun-22 | June 18-June 24, 2022 | 45,507.00 | 81.42 | 5,926.49 | 51,514.91 |
| CA12C500008262 | 01-Jul-22 | June 25-July 1, 2022 | 20,909.50 | 1,884.60 | 2,963.24 | 25,757.34 |
| CA12C500008278 | 12-Jul-22 | July 2-July 8, 2022 | 26,088.50 | - | 3,391.51 | 29,480.01 |
| CA12C500008302 | 20-Jul-22 | July 9-July 15, 2022 | 37,371.50 | - | 4,858.30 | 42,229.80 |
| CA12C500008317 | 27-Jul-22 | July 16-July 22, 2022 | 26,760.00 | - | 3,478.80 | 30,238.80 |
| CA12C500008333 | 03-Aug-22 | July 23-July 29, 2022 | 17,175.50 | - | 2,232.82 | 19,408.32 |
| CA12C500008356 | 09-Aug-22 | July 30-August 5, 2022 | 27,162.50 | - | 3,531.13 | 30,693.63 |
| CA12C500008384 | 16-Aug-22 | August 6-Aug 12, 2022 | 24,585.50 | - | 3,196.12 | 27,781.62 |
| CA12C500008404 | 23-Aug-22 | August 13-Aug 19, 2022 | 12,242.50 | - | 1,591.53 | 13,834.03 |
| CA12C500008418 | 30-Aug-22 | August 20-Aug 26, 2022 | 20,828.00 | - | 2,707.64 | 23,535.64 |
| CA12C500008440 | 06-Sep-22 | August 27-Sept 2, 2022 | 15,861.50 | - | 2,062.00 | 17,923.50 |
| CA12C500008459 | 13-Sep-22 | September 3-Sept 9, 2022 | 30,470.50 | - | 3,961.17 | 34,431.67 |
| CA12C500008475 | 20-Sep-22 | September 10-Sept 16, 2022 | 28,007.50 | - | 3,640.97 | 31,648.47 |
| CA12C500008493 | 27-Sep-22 | September 17-Sept 23, 2022 | 25,286.50 | - | 3,287.24 | 28,573.74 |
| CA12C500008506 | 04-Oct-22 | September 24-Sept 30, 2022 | 18,014.00 | - | 2,341.82 | 20,355.82 |
| CA12C500008524 | 11-Oct-22 | October 1-Oct 7, 2022 | 43,487.50 | - | 5,653.37 | 49,140.87 |
| CA12C500008550 | 18-Oct-22 | October 8-Oct 14, 2022 | 41,627.50 | - | 5,411.57 | 47,039.07 |
| CA12C500008570 | 25-Oct-22 | October 15-Oct 21, 2022 | 44,611.00 | - | 5,799.43 | 50,410.43 |
| CA12C500008589 | 01-Nov-22 | October 22-Oct 28, 2022 | 58,095.00 | 112.46 | 7,566.97 | 65,774.43 |
| | | **Grand Total (CAD)** | **2,351,108.00** | **30,823.55** | **309,651.22** | **2,691,582.77** |



**Nortel Networks**
**Professional Fees - Ernst & Young Inc (CAD)**
**November 1, 2021 to October 31, 2022**

| Name | Rank | Avg. Hourly Rate | Total Hours | Total Fees (CAD) | Significant Activities |
|---|---|---|---|---|---|
| McDonald, Murray | Partner | 1,200 | 18.5 | 22,192.5 | CCAA Administration |
| Partners < 20 hours | | 1,205 | 18.4 | 22,176.0 | |
| | **Total Partners** | **1,202** | **36.9** | **44,368.5** | |
| Beekenkamp, Brent | Associate Partner | 940 | 355.2 | 333,804.0 | CCAA Administration / Distribution / 4th Estate/ Claims Resolution / Tax Reporting |
| Tuck, Andrew | Associate Partner | 935 | 244.3 | 228,420.5 | CCAA Administration / Distribution |
| Associate Partner < 20 hours | | 935 | 0.9 | 841.5 | |
| | **Total Associate Partner** | **938** | **600.4** | **563,066.0** | |
| Close, Lee | Senior Manager | 857 | 360.4 | 308,882.0 | CCAA Administration / Distribution |
| Yau, Edmund | Senior Manager | 859 | 352.4 | 302,578.0 | CCAA Administration / Distribution / 4th Estate/ Claims Resolution / Tax Reporting |
| Senior Managers < 20 hours | | 855 | 2.6 | 2,223.0 | |
| | **Total Senior Manager** | **858** | **715.4** | **613,683.0** | |
| Tardif, Jocelyn | Manager | 652 | 202.5 | 132,072.0 | Distribution |
| Wang, Lei | Manager | 677 | 34.1 | 23,071.5 | Tax Reporting |
| Ferland, Alexandre | Manager | 650 | 25.2 | 16,380.0 | Distribution |
| Kaur, Gurpreet | Manager | 650 | 26.0 | 16,900.0 | Distribution |
| | **Total Manager** | **655** | **287.8** | **188,423.5** | |
| Sangha, Kinderjit | Para Professional | 346 | 1,449.6 | 501,778.5 | Distribution |
| Ferguson, Rob | Para Professional | 346 | 994.9 | 344,316.0 | CCAA Administration / Distribution |
| Bear, Cam | Para Professional | 346 | 206.0 | 71,307.0 | Distribution |
| Carandang, Tess | Para Professional | 346 | 28.8 | 9,952.5 | Distribution |
| Para Professional < 20 hours | | 345 | 7.4 | 2,553.0 | |
| | **Total Para Professional** | **346** | **2,686.7** | **929,907.0** | |
| Khodair, Shady | Staff | 348 | 31.5 | 10,967.0 | Tax Reporting |
| Staff / Translators < 20 hours | | 210 | 3.3 | 693.0 | |
| | **Total Staff** | **335** | **34.8** | **11,660.0** | |
| | **Grand Total (CAD)** | **539** | **4,362.0** | **2,351,108.0** | |

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION *et al.*

---

*ONTARIO*
**SUPERIOR COURT OF JUSTICE (COMMERCIAL LIST)**

Proceeding commenced at Toronto

---

**ONE HUNDRED AND SIXTY FIRST REPORT OF THE MONITOR DATED NOVEMBER 17, 2022**

---

**GOODMANS LLP**
Barristers & Solicitors
Bay Adelaide Centre
333 Bay Street, Suite 3400
Toronto, ON  M5H 2S7

**Joseph Pasquariello (LSO# 38390C)**
jpasquariello@goodmans.ca

**Christopher G. Armstrong (LSO# 55148B)**
carmstrong@goodmans.ca

Tel: 416.979.2211
Fax: 416.979.1234
**Lawyers for the Monitor, Ernst & Young Inc.**